Jacquelyn FAISON, et al., Plaintiffs,

v.

WYETH, INC., et al., Defendants.

No. 404CV082.

United States District Court,
S.D. Georgia,
Savannah Division.

Dec. 9, 2004.

Russell T. Abney, The Watts Law Firm, Jonathan J. Ross, Michael A. Lee, Susman Godfrey, LLP, Houston, TX, for Plaintiffs.

Stephen M. Lore, Stephen M. Brooks, Nelson, Mullins, Riley & Scarborough, LLP, Atlanta, GA, for Defendants.

## ORDER

EDENFIELD, District Judge.

## I. INTRODUCTION

Plaintiffs, all residents of Georgia, sued Wyeth companies (Wyeth) and Wyeth sales representatives in a Georgia state court seeking damages for valvular heart disease (VHD), which they incurred after ingesting the diet drugs "fenfluramine (Pondimin), dexfenfluramine (Redux), and/or phentermine." Doc. # 1 exh. 3 at 2. Defendants removed the case to this Court based on diversity jurisdiction. Doc. # 1. They claim that the plaintiffs fraudulently joined Georgia-resident sales reps as defendants in order to avoid diversity jurisdiction. *Id.*

This Court issued a stay of F.R.Civ.P. 16 and 26 obligations pending a determination of whether this action would be transferred to the United States District Court for the Eastern District of Pennsylvania (the "MDL Court") for coordinated and/or consolidated pretrial proceedings. Doc. # 22. Meanwhile, plaintiffs move this Court to remand the case back to state court. Doc. # 21.

## II. BACKGROUND

Wyeth produced and marketed the diet drugs Pondimin and Redux, which became associated with VHD in 7/97 and were removed from the market in 9/97. Pondimin's active ingredient, fenfluramine, was approved by the Food and Drug Administration (FDA) in 1973 for use as an "appetite suppressant[ ] for the short-term (a few weeks) management of obesity." FDA, *Fen–Phen Questions and Answers,* at http://www.fda.gov/cder/news/phen/fenphenqa2.htm (posted 9/18/97) (hereafter, FDA–Q & A) (copy attached as APPENDIX A).

The fenfluramine compound contains two enantiomers (mirror-imaged versions of the chemical), dexfenfluramine (D-fenfluramine) and levofenfluramine (L-fenfluramine). *Id.* Enantiomers usually have identical chemical and physical properties, but are often distinguished by their different pharmacologic or toxicologic effects.[1] *See* FDA, *FDA's Policy Statement for the Development of New Stereoisomeric Drugs,* at http://www.fda.gov/cder/guidance/stereo.htm (published 5/1/92).

D-fenfluramine and L-fenfluramine are enantiomers that cause different pharmacologic and toxicologic effects. L-fenfluramine, for example, may have some activities not directly related to appetite suppression that D-fenfluramine lacks. FDA–Q & A. And plaintiffs claim D-fenfluramine, rather than L-fenfluramine, was the predominant anorectic (appetite-suppressing) ingredient in fenfluramine (Pondimin). Doc. # 21 at 13.

Consequently, Redux was developed, a diet drug containing only D-fenfluramine. Redux afforded the same anorectic effects as Pondimin while reducing the adverse side effects. *In re Diet Drugs,* 2000 WL 1222042 at *1 (E.D.Pa.8/28/00) (unpublished); doc. # 21 at 13. The FDA approved Redux in 1996 for long-term use as "an appetite suppressant in the manage-

---

1. One might consider the right and left hands to be "enantiomers"—identical objects, yet distinct in their three-dimensional arrangement. Consequently, the seemingly-identical hands interact differently with objects, as can be quickly appreciated by trying to put one's right hand into a left-hand glove. The three-dimensional arrangement of chemicals, likewise, may cause different interactions and responses within the human body.

ment of obesity." FDA–Q & A; *see also* S.M. Cruzan, FDA, *Dexfenfluramine Labeling To Be Updated,* at http://www.fda.gov/bbs/topics/AN-SWERS/ANS00756.html (posted 8/22/96).

Pondimin became a significant diet drug in 1992, after published articles suggested that the combined use of phentermine (another short-term diet drug approved in 1959) and fenfluramine would result in significant weight loss when used over an extended period of time. FDA–Q & A. The ingestion of phentermine helped counteract some of the adverse effects of fenfluramine used by itself. *In re Diet Drugs,* 220 F.Supp.2d 414, 420 (E.D.Pa.2002). The results of these studies were not reviewed by the FDA, and the conclusions about long-term use of the combined drugs never received FDA approval. FDA–Q & A.

While manufacturers are prohibited from promoting an "off-label" use (use beyond its "labeled" purpose), physicians are free to prescribe same. *Hamm v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.,* 187 F.3d 941, 946 (8th Cir.1999). Consequently, the 1992 publications generated a marked increase in the amount and duration of Pondimin use, as it became widely prescribed as part of the off-label "fen-phen" regimen. Doc. # 21 at 16; FDA–Q & A.

Scientists were fully aware that Pondimin posed a risk of primary pulmonary hypertension (PPH) to users, and it carried a warning label to that effect since 1987. Doc. # 35 at 15. But Pondimin's VHD risk was not made public until 7/8/97. FDA–Q & A.

In 1996, Wyeth began to market and sell the FDA-approved Redux as a longer term, safer alternative to Pondimin. Doc. # 21 at 16. However, in 7/97 the Mayo Clinic reported that 24 patients developed VHD after taking the "fen-phen" combo. FDA–Q & A. In 9/97, Wyeth took Pondimin and Redux off the market. Subsequently, the causal relationship between

VHD, Redux and Pondimin was investigated and confirmed in studies published in 9/98, and a wave of litigation followed. *In re Diet Drugs,* 2000 WL 1222042 at *2.

Approximately 53,000 plaintiffs who used Pondimin or Redux have opted out of a class action settlement against Wyeth. S.H. Pollak, *Fen–Phen Trials May Test New Damages System,* 12/1/04 Fulton County Daily Report at 1. To facilitate the large number of cases filed in federal courts, the Judicial Panel for Multi-district Litigation has transferred federal "fen-phen" cases to the MDL Court for coordinated and/or consolidated pretrial proceedings. Doc. # 1 at 2.

Wyeth has consistently attempted to remove "fen-phen" cases from state courts to federal courts for transfer to the federal MDL Court. Doc. # 35 at 4–6. It claims that, in an obvious effort to avoid the MDL, opt-out plaintiffs have repeatedly included in-state residents (*e.g.,* Wyeth sales reps) as defendants in order to fraudulently defeat diversity jurisdiction and thus keep their cases in state court. *Id.;* doc. # 1 at 3. Numerous "fen-phen" cases have been cited to this Court with opinions going both ways on the fraudulent joinder and remand issues. Doc. # 35 at 10; doc. # 21 at 5.

In this case Georgia-resident plaintiffs similarly pursued claims in state court against the Wyeth companies and its Georgia-resident sales reps. Plaintiffs claim the sales reps misrepresented to doctors the diet drugs' risks. Removing the case to this Court, defendants argue that the plaintiffs fraudulently joined the sales rep defendants for the sole purpose of defeating diversity jurisdiction. Doc. # 1.

**A. Governing Standards**

In its last Order the Court reviewed the governing law. Doc. # 46. Because federal courts possess only limited jurisdiction and removal raises significant

federalism concerns, "all doubts about jurisdiction should be resolved in favor of remand to state court." *University of South Alabama v. American Tobacco Co.,* 168 F.3d 405, 411 (11th Cir.1999). Where removal is based on fraudulent joinder, "the removing party has the burden of proving that either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court." *Crowe v. Coleman,* 113 F.3d 1536, 1538 (11th Cir.1997).

■ The removing party's burden is a "heavy one." *Id.* Where plaintiffs state "even a colorable claim" against a resident defendant, the case should be remanded to state court. *Pacheco de Perez v. AT & T Co.,* 139 F.3d 1368, 1380 (11th Cir.1998). In other words, "after drawing all reasonable inferences from the record in the plaintiff's favor and then resolving all contested issues of fact in favor of the plaintiff, there need only be a reasonable basis for predicting that the state law might impose liability on the facts involved." *Crowe,* 113 F.3d at 1538 (quotes and cite omitted).

"The federal court makes these determinations based on the plaintiff's pleadings at the time of removal; but the court may consider affidavits and deposition transcripts submitted by the parties." *Id.* at 1538. "[T]he district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims. Although ... district courts may look beyond the face of the complaint, [they should] stop short of adjudicating the merits of cases that do not appear readily to be frivolous or fraudulent." *Id.* at 1542.

## B. Arguments

Defendants argue that the claims against Wyeth sales reps "lack a reason-

able basis." Doc. # 35 at 1. They argue that every court to have considered the issue—whether Wyeth sales reps are proper defendants—has found fraudulent joinder. *Id.* at 1–2.

Defendants also note that plaintiffs' "Complaint alleges identical, boilerplate claims against the sales representative defendants for negligence, fraud, and conspiracy. Plaintiffs do not specify which sales representatives allegedly spoke to which doctors, what they supposedly said, and when they allegedly said it. Nowhere in their Complaints or their motions to remand do Plaintiffs identify which specific drug they took or the dates they took the drugs." *Id.* at 3.

Defendants insist that, based on prior decisions cited, the single relevant issue is "whether these defendants knew of the risk of VHD and concealed that risk from these Plaintiffs' prescribing doctors prior to the public disclosure of that information on [7/8/97]." *Id.* They offer affidavits from each of the sales reps swearing that they did not "detail" (promote) Pondimin during the relevant time period; they were unaware of the VHD risks from Pondimin or Redux; and they did not misrepresent the safety of these drugs. Doc. # 1 exh. 4.

Mindful of the prior decisions on this issue, plaintiffs attempt to expand on the classic theories of liability. To establish a link between the sales reps and the Pondimin drug, they claim that, because Pondimin and Redux both contain D-fenfluramine, "any knowledge that sales representatives had about the dangers of Pondimin was also knowledge of the dangers of Redux, and vice versa," and any duty to warn about Redux was also a duty to warn about Pondimin. Doc. # 21 at 13. They thus assert that Pondimin and Redux were "the same drug." So Wyeth's sales reps were not simply Re-

dux salesman, but "dexfenfluramine salesmen." Doc. # 40 at 5.

Plaintiffs also argue that knowledge of the VHD risk is irrelevant. The relevant analysis, they maintain, involves the sales reps' failure to fully disclose the "totality of the risks" of D-fenfluramine (*i.e.,* whether they failed to fully disclose the risk of PPH). Doc. # 40 at 4. If the sales reps had not misrepresented the PPH risk, they argue, then plaintiffs would not have taken the drug and thus would not have incurred VHD.

This Court's last Order recognized that "the relevant legal analysis depends on whether plaintiffs ingested Pondimin, Redux, phentermine, or a combination thereof." Doc. # 46 at 2. It thus directed plaintiffs to provide the Court with information on the diet drugs each plaintiff ingested. *Id.*

Plaintiffs respond that 12 of 13 plaintiffs ingested Pondimin (some in combination with phentermine or other drugs). Doc. # 47 at 2, app. A. The single plaintiff who ingested Redux, June Moxley, did so for one month. *Id.* But she had also ingested Pondimin for nine months prior to her ingestion of Redux. Doc. # 47 app. A.

## III. ANALYSIS

■ Plaintiffs correctly state that under Georgia law sales rep defendants "can be personally liable for their own tortious acts, fraudulent statements or omissions and knowing, reckless and negligent misrepresentations." Doc. # 21 at 6; *Wilkes v. Rankin–Whitten Realty Co.,* 65 Ga.App. 341, 16 S.E.2d 170, 172 (1941) ("An agent is personally liable for false representations which induced the purchasing of

property of his principal which would not otherwise have been purchased").

And Wyeth correctly states that the sales reps here may only be found liable for their individual torts, not for the tortious conduct of their company. Doc. # 35 at 8; *DCA Architects, Inc. v. American Bldg. Consultants, Inc.,* 203 Ga.App. 598, 417 S.E.2d 386, 389 (1992); *Leal v. Hobbs,* 245 Ga.App. 443, 538 S.E.2d 89, 91 (2000) ("the doctrine of vicarious liability does not make the agent liable for the acts of the principal").

■ Plaintiffs' Complaint alleges that the sales reps entered into a conspiracy to conceal and fraudulently misrepresent material information. Doc. # 1 exh. 3 at 38. However, under Georgia law, employees acting within the scope of employment are considered part of the corporation, and a corporation cannot conspire with itself. *Nalley Northside Chevrolet, Inc. v. Herring,* 215 Ga.App. 185, 450 S.E.2d 452, 455 (1994); *Alta Anesthesia Associates of Georgia, P.C. v. Gibbons,* 245 Ga.App. 79, 537 S.E.2d 388, 394 (2000). Hence, this Court must review plaintiffs' claims to determine if there is a reasonable basis for predicting that the state law might impose liability against the resident sales reps individually for negligent, reckless, or fraudulent misrepresentations or omissions.

Plaintiffs cite numerous unpublished orders remanding fen-phen cases. Doc. # 21 at 5 n. 1. Yet their cited Eleventh Circuit cases, as well as the published cases from other jurisdictions that they cite, do not deal with the joinder of Wyeth sales reps.

To the contrary, it appears[2] that in almost every case analyzing the joinder of

---

**2.** Plaintiffs claim that the defendants are "cherry-picking" from among dozens of cases that have addressed the remand issue. Doc. # 47 at 3 n. 2. Yet, they then neglect to cite specific cases where sales reps are found to be appropriate defendants. The single case

they do reference (in an earlier brief, doc. # 21 at 31), which found joinder of sales reps appropriate, is inapplicable here. Unlike here, the sales rep's affidavit in *St. Martin v. Wyeth, Inc.,* 03CV0637 (D.N.M. Order filed

sales reps, the court denied remand due to fraudulent joinder.[3] In those cases the courts relied on affidavits similar to the ones presented here (claiming the sales reps did not promote Pondimin or have knowledge of a VHD risk). Doc. # 1 exh. 4. Based on these affidavits, courts found that the Wyeth sales reps in those cases had no knowledge that Pondimin or Redux created a VHD risk until informed of the 7/97 publication. *See Burns,* 04CV87 at 9; *Davis,* 403CV128 at 11.

Plaintiffs fail to cite to any evidence showing that the defendant sales reps here had knowledge, or reason to know, of the VHD risk prior to the 1997 publication (the drug was taken off the market two months later). *See* doc. # 21 at 12, 21. And this Court is entitled to rely on the sales reps' affidavits swearing that they did not possess this knowledge. *Crowe,* 113 F.3d at 1538. Hence, the sales reps had no knowledge, or reason to know, of the risk. Absent such knowledge, they cannot be held liable for fraudulent concealment or negligent failure to warn plaintiffs of the VHD risk.

Other courts, incidentally, have also accepted the sales reps' sworn claims (also present here) that they promoted only Re-dux and not Pondimin. *In re Fen–Phen Litig.,* No 1:03–MD–1–RLV at 3; *In re Diet Drugs,* 03CV20153 at 17; *Burns,* 04CV87 at 9. Applying this fact, they determined that the sales reps could not be held liable for injuries sustained from ingesting Pondimin if they never promoted that drug to the prescribing doctors.

In rebuttal, plaintiffs here assert that Wyeth employees must deny promoting Pondimin because to acknowledge it would be admitting to illegal conduct (promoting an off-label use of a drug). Doc. # 21 at 24. Aside from the fact that this assertion supports, rather than detracts from, the sales reps' claims, this Court will not simply presume—without supporting evidence—that the reps participated in illegal conduct.

Plaintiff makes other general allegations that Wyeth did in fact promote Pondimin's off-label use, and therefore, its reps must have done so as well. *See* doc. # 21 at 25–33. They even provide deposition testimony from doctors in other cases indicating that some Wyeth reps had promoted Pondimin. Doc. # 21 at 30. But even after taking the deposition of one sales rep in this case, plaintiffs cannot validly assert

---

2003), was internally inconsistent and did not refute the allegations made in the complaint.

**3.** *See Catlett v. Wyeth, Inc.,* 504CV154–2 (M.D.Ga. Order filed 9/14/04) (unpublished) (copy at doc. # 43 exh. A) (fraudulent joinder because sales reps could not be held individually liable for providing doctors with the information Wyeth gave to them; and conspiracy not recognized against sales reps in Georgia); *Davis v. Wyeth, Inc.,* 403CV128 (M.D.Ga. Order filed 6/10/04) (unpublished) (copy at doc. # 35 exh. 1) (fraudulent joinder because no evidence of sales reps' knowledge of association between Redux and heart disease); *In re Fen–Phen Litig.,* 1:03–MD–1 (N.D.Ga. Order filed 10/14/03) (unpublished) (copy at doc. # 35 exh. 2) (finding fraudulent joinder); *Burns v. Wyeth, Inc.,* 04CV87 (E.D.Ky. Order filed 11/12/04) (unpublished)

(copy at doc. # 48 exh. A) (joinder of sales reps fraudulent when plaintiffs could not specify when, where or what misrepresentations occurred; reps did not market pondimin; and reps had no knowledge of VHD risk); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litig.,* 2004 WL 2203712 at *2 (E.D.Pa. Order filed 9/28/04) (unpublished) (Wyeth sales reps were fraudulently joined because they did not assume individual liability merely by participating in their employer's purported failure to provide adequate information); *In re Diet Drugs,* 03CV20153 (E.D.Pa. Order filed 7/30/03) (copy at doc. # 48 exh. B) (fraudulent joinder because sales reps promoted Redux, not Pondimin, and 5 of 6 plaintiffs took Pondimin). For additional citations, see doc. # 35 at 10 n. 10.

that any defendant *in this case* promoted Pondimin to plaintiffs' prescribing doctors.[4] Doc. # 44 at 3. Hence, the Court finds that the defendant sales reps did not directly promote Pondimin to plaintiffs' prescribing physicians.

After having determined that Wyeth sales reps did not promote Pondimin and did not have knowledge that Pondimin or Redux posed a VHD risk to patients, previous courts concluded that the sales reps in those cases were fraudulently joined. *See, e.g., supra* note 3. However, plaintiffs here make the added claim that "Wyeth's assertions regarding the 'detailing' [promotion] of Pondimin are irrelevant" because liability may be premised on their promotion of Redux. Doc. # 40 at 5.

This argument proceeds as follows: (a) Pondimin and Redux "are the same drug"; so (b) promotion of Redux impliedly endorses Pondimin as an equally safe alternative; therefore (c) misrepresentation of the "totality of the risks" for Redux creates an implied misrepresentation about Pondimin's risks; and (d) plaintiffs' doctors prescribed Pondimin in reliance on these implied misrepresentations; leading to the conclusion that (e) sales reps who promoted Redux can be held liable to plaintiffs who ingested Pondimin and thereby incurred VHD. *See generally* doc. ## 21, 40, 44, 47.

This argument fails at every stage. First, it depends on the fact that doctors and, more importantly, Wyeth sales reps believed in 1995–1997 that Redux and Pondimin were in fact "the same drug." Un-

der their theory, the sales reps must know this in order to have a duty to disclose Redux risks to doctors who then decide whether to prescribe Pondimin. And doctors must know this in order create a causal connection between representations about Redux and their subsequent prescribing of Pondimin. Yet this was clearly not the case.

Again, Pondimin was at least perceived to be different than Redux because it contains both enantiomers of the fenfluramine compound. And enantiomers can cause different pharmacologic responses. In this instance, only D-fenfluramine generated the desired anorectic effects, and scientists suspected that L-fenfluramine caused much of the undesired side effects. FDA–Q & A. Because of the perceived differences in the drugs, the FDA approved Redux for longer-term use. *Id.* Likewise, as plaintiffs contend, Wyeth marketed Redux as a safer alternative to Pondimin. Doc. # 21 at 13, 16.

Plaintiffs therefore cannot validly claim that Wyeth sales reps or doctors knew more than the prevailing science at that time. And they cannot reasonably contend that Wyeth tricked "both doctors and patients" into believing Redux was a *different* drug (doc. # 21 at 16) and at the same time claim that the doctors knew the two were in fact "the *same* drug." Doc. # 40 at 5 (emphasis added).

For that matter, step (b) of plaintiffs' argument is self-defeating. Relying on the notion that Pondimin and Redux are "the

---

**4.** Plaintiffs state "Mr. Bacon admits that he did [promote Pondimin]." Doc. # 44 at 3. Yet they cite only the following testimony to support that assertion:

Q. Right. And you would ask doctors to use Redux instead of Pondimin, correct?
A. To consider it.
Q. Okay. And would you discuss with doctors why Redux was a better alternative than Pondimin?

A. We had no head-to-head comparisons, but being it was a dexisomer, the medical community understood that, and *we really did not get into those discussions.* Side effect profile mainly, as well as the maintenance indication.

*Id.* at 134. (emphasis added). This testimony does not support plaintiffs' assertion that Wyeth sales rep Bacon promoted Pondimin.

same drug," plaintiffs contend that promotion of Redux creates an implicit misrepresentation about the safety of Pondimin. Yet, plaintiffs also claim "Wyeth and its sales force knowingly misrepresented the association between Pondimin, fen/phen, Redux, and VHD from physicians and from the public." Doc. # 21 at 11. They claim Wyeth deceptively marketed Redux as a safer alternative to Pondimin, when it was in fact not safer at all. Doc. # 21 at 13, 16.

Yet in making such claims, plaintiffs undermine the very causal connection they are attempting to establish. If Wyeth deceptively marketed Redux as a safer alternative, it necessarily implied that Pondimin was less safe than Redux. Plaintiffs cannot then claim that doctors correlated Redux risks directly with Pondimin risks. To the contrary, the marketing of Redux would seem to emphasize, rather than deemphasize, the "totality of the risks" associated with Pondimin. Hence, this second stage of plaintiffs' argument fails as well. The sales reps' promotion of Redux does not act as a legal surrogate for promotion of Pondimin. It follows that, with respect to the plaintiffs who ingested Pondimin, and not Redux, the sales reps are not proper defendants.

Plaintiffs further argue that, since Redux and Pondimin both contain D-fenfluramine, the sales reps misrepresented the risks of Redux by touting it as a safer alternative. While the argument does not convince this Court that the sales reps could be held liable for injuries sustained from *Pondimin,* plaintiffs who ingested *Redux* might still have a colorable claim against one or more reps on these grounds. *See Pacheco de Perez,* 139 F.3d at 1380.

To that end, plaintiffs also claim that the case should be remanded because a single resident plaintiff, Moxley, ingested Redux and can thus make a colorable claim against a single resident sales rep. Doc. # 47 at 2. However, as the Court has already determined, the sales reps did not have knowledge, or reason to know, of the VHD risk that Redux posed.

Plaintiffs thus proffer an alternative argument—they claim that the sales rep misrepresented the "totality of the risks" posed by Redux. Doc. # 40 at 4. Moxley would not have ingested Redux, plaintiffs argue, if the sales rep had fully disclosed Redux's PPH risk. Since she would not have incurred VHD but for the misrepresentations about PPH, the sales rep should be liable.

The Court need not determine whether a misrepresentation about PPH risks can be a proximate cause for VHD injuries because no plaintiff can validly claim injuries sustained from ingesting Redux. Only one plaintiff (out of 13) ingested Redux. Doc. # 47 at 2. But even for that plaintiff, Redux amounted to one tenth of the diet pills she ingested—she ingested Pondimin for nine months prior to ingesting Redux for one month. Doc. # 47 exh A. Hence, by plaintiffs' own logic (*i.e.,* that Pondimin and Redux are "the same drug" and pose the same VHD risk), there is a 90% chance she incurred VHD from ingesting Pondimin and only a 10% chance she incurred VHD from ingesting Redux.

The sales rep can only be liable for injuries caused by Redux. Moxley bears the burden at trial of proving more likely than not that she suffered injury by ingesting Redux. But on the face of her claim, at most she can prove a 10% chance (hence, *not* more likely than not) that she suffered injury from ingesting Redux.

Therefore, she can not possibly prove a causal connection between her injury and misrepresentations made about Redux. Hence, her claims against the sales reps have no merit and the sales reps were fraudulently joined on that score as well.

*See also In re Diet Drugs,* 03CV20153 (E.D.Pa. Order filed 7/30/03) (unpublished) (copy at doc. # 48 exh. B) (fraudulent joinder because sales reps marketed Redux, not Pondimin, and 5 of 6 plaintiffs took Pondimin).

## IV. CONCLUSION

Therefore the Court finds that diversity jurisdiction exists because the non-diverse defendants were fraudulently joined. Plaintiffs' motion to remand (doc. ## 21, 44) is *DENIED.*

## APPENDIX

### Questions and Answers about Withdrawal of Fenfluramine (Pondimin) and Dexfenfluramine (Redux)

**1. What is "fen-phen"?**

Fen-phen refers to the use in combination of fenfluramine and phentermine. Phentermine has also been used in combination with dexfenfluramine ("dexfenphen"). Fenfluramine ("fen") and phentermine ("phen") are prescription medications that have been approved by the FDA for many years as appetite suppressants for the short-term (a few weeks) management of obesity. Phentermine was approved in 1959 and fenfluramine in 1973. Dexfenfluramine (Redux) was approved in 1996 for use as an appetite suppressant in the management of obesity. Recently, some physicians have prescribed fenfluramine or dexfenfluramine in combination with phentermine, often for extended periods of time, for use in weight loss programs. Use of drugs in ways other than described in the FDA-approved label is called "off-label use." In the case of fenphen and dexfen-phen, no studies were presented to the FDA to demonstrate either the effectiveness or safety of the drugs taken in combination.

**2. What is the difference between fenfluramine and dexfenfluramine?**

Fenfluramine (Pondimin) contains dexfenfluramine and levofenfluramine. Levofenfluramine may have some activities not directly related to appetite suppression. Dexfenfluramine (Redux) contains only dexfenfluramine.

**3. What is the new evidence that prompted withdrawal of fenfluramine and dexfenfluramine?**

On July 8, 1997, the Mayo Clinic reported 24 patients developed heart valve disease after taking fen-phen. In five patients who underwent valve replacement surgery, the diseased valves were found to have distinctive features similar to those seen in carcinoid syndrome. The cluster of unusual cases of valve disease in fenphen users suggested that there might be an association between fen-phen use and valve disease.

On July 8, FDA issued a Public Health Advisory that described the Mayo findings. The Mayo findings were reported in the August 28 issue of the *New England Journal of Medicine,* along with an FDA letter to the editor describing additional cases. FDA has received over 100 reports (including the original 24 Mayo cases) of heart valve disease associated mainly with fen-phen. There were also reports of cases of heart valve disease in patients taking only fenfluramine or dexfenfluramine. No cases meeting FDA's definition of a case were reported in patients taking phentermine alone.

Within the past several weeks, additional information received by the FDA has raised more concern. Most of the cases previously brought to the FDA's attention were in patients who had symptoms of heart disease. Recently, FDA has received reports from five physicians who had performed heart studies (echocardio-

grams) on patients who had received fen-phen or dexfen-phen and did not have symptoms of heart disease. Of 291 asymptomatic patients screened, about 30 percent had abnormal valve findings, primarily aortic regurgitation. Based on these data, the manufacturers have agreed to withdraw the products from the market and FDA has recommended that patients stop taking the drugs.

### 4. Why isn't phentermine being withdrawn from the market?

At the present time, no cases of heart valve disease meeting FDA's case definition have been reported with phentermine alone. Analysis of the data points to an association of heart valve disease with fenfluramine and dexfenfluramine.

### 5. Why wasn't this problem discovered earlier?

The type of valve disease that FDA believes may be associated with fenfluramine and dexfenfluramine is an extremely unusual type of drug reaction. Because valve disease is not usually associated with drug use, it is not normally screened for in human clinical testing of drugs. Since valvular heart disease is not screened for in clinical trials, it would usually not be detected unless patients developed symptoms. No cases were detected in 500 patients followed for one year in a clinical trial of dexfenfluramine. Furthermore, asymptomatic heart valve disease (heart valve disease without symptoms) would not likely be detected in patients taking the drugs as part of a weight loss program. The number of patients who have been reported to have symptoms of heart valve disease associated with recent exposure to the drugs has been very small, compared to the number of recent prescriptions, although there may be a delay in the development of symptoms. And even in symptomatic patients, the link between the symptoms and drug use may not be obvious because such a reaction is not common. These factors may explain why this problem was not discovered earlier.

During the last few years, there has been a marked increase in amount and duration of use of fenfluramine, as it became widely prescribed as part of the fen-phen regimen.

In 1992, articles were published about study results suggesting that the combined use of phentermine and fenfluramine would result in significant weight loss when used over an extended period of time. The results of these studies were not reviewed by FDA, and the conclusion about long-term use of the combination of drugs has not received FDA approval. The increased magnitude and duration of use probably led to an increase in the number of cases of symptomatic heart valve disease, which may have contributed to the recent recognition of this association.

With respect to dexfenfluramine (Redux), which was approved on April 29, 1996, the labeling states that safety has not been shown for longer than one year of use. This reflects the length of the study upon which dexfenfluramine was approved. It was a one-year European study of 1,000 subjects, half of whom were treated with dexfenfluramine. The study population was 80 percent women with an average age of 41. Heart disease was not noted in the study. A follow-up study directed toward uncovering heart disease after termination of the study was not performed because there was no reason to believe at that time that the heart was affected. In addition, dexfenfluramine had been marketed in Europe for over a decade without detection of an association between dexfenfluramine and heart valve problems. FDA

is currently trying to obtain such follow-up.

## 6. What is valvular heart disease?

The heart contains four major valves that regulate the flow of blood through the heart and to the lungs and general circulation. Disease may cause excessive tightness (stenosis) or leakiness (regurgitation) of the valves. In the case of valve disease associated with fenfluramine and dexfenfluramine, leakiness is the problem. Valvular damage may ultimately produce severe heart and/or lung disease.

## 7. What is the relationship of fenfluramine and dexfenfluramine to heart disease?

Patients who have taken those drugs may have changes in their heart valves that cause leakiness and backflow of blood. If this is severe, the heart has to work harder. This may cause problems in heart function. However, the full medical implications of this relationship, especially in the asymptomatic patients, is not fully understood.

## 8. What are the signs and symptoms of valvular heart disease?

The patient may have no symptoms. The physician may hear a new heart murmur (abnormal sound as the blood flows over a valve), or the changes may be detected with a painless, non-invasive special heart test called an echocardiogram. An echocardiogram is usually performed by a cardiologist. If the disease is severe, the patient may experience such symptoms as shortness of breath, excessive tiredness, chest pain, fainting, and swelling of the legs (edema).

## 9. Is the valve disease reversible?

It is not known at this time. One report has been submitted to FDA in which the valve disease appeared to improve. However, we encourage those people who have taken fenfluramine or dexfenfluramine to contact their physician and discuss the appropriate follow-up, even after stopping their medicine. The full medical implications of these findings are not known at this time, especially as they relate to the asymptomatic valvular changes. The FDA and other government agencies, the manufacturers, and medical researchers will aggressively follow this concern and keep patients and health care providers informed of what is learned about the natural history of the valvular disease caused by these medications.

## 10. How is valvular disease treated?

It depends on the degree of damage. Medications may help the heart function. If the damage is severe, the valves may have to be replaced surgically.

## 11. Should I stop taking fen-phen, fenfluramine or dexfenfluramine right now?

Yes, this is the FDA's recommendation. Although we believe these drugs can be stopped at once for most persons, you should consult your physician about whether he/she advises you to taper the dosage over, for example, a 1 to 2 week period. The manufacturers of these drugs are withdrawing fenfluramine and dexfenfluramine from the marketplace, effective September 15, as the concerns about the effects of these drugs on heart valves continue to grow. The drugs will no longer be available in pharmacies. Though the potential long-term medical implications are not known at this time as there are still a number of unanswered questions, the FDA and the manufacturers believe it is in the best interest of the patients that they stop taking these medications. Please be aware that at present this rec-

 

ommendation does not apply to phentermine taken alone.

### 12. Should I get an echocardiogram if I've been taking fenfluramine or dexfenfluramine?

You should consult your physician about having an echocardiogram. Your physician's recommendation will depend upon your symptoms, if any, his or her examination of you and your history of exposure to these drugs.

### 13. Does "herbal fen-phen" have the same problem?

Herbal fen-phen is a product that does not contain fenfluramine, dexfenfluramine, or phentermine. Products called "herbal fen-phen" often contain a combination of ephedra (an ephedrine containing herb) and caffeine, but may also contain other herbal ingredients. FDA has not reviewed these herbal products for safety or efficacy. Ephedrine is pharmacologically different from fenfluramine and dexfenfluramine.

### 14. Can selective serotonin reuptake inhibitor (SSRI) antidepressants such as Prozac, Zoloft, Luvox and Paxil be substituted for fenfluramine in the phen/fen combination?

FDA has not reviewed the safety or efficacy of such combinations and has not approved their use. These drugs are active in serotonin metabolism but have somewhat different activity than fenfluramine and dexfenfluramine. No currently available weight-loss drugs have been studied adequately in combinations to permit a recommendation by FDA for combined use.

### 15. I have heard the FDA recently denied a citizen petition that sought to suspend the approval of Redux (dexfenfluramine). Why did the FDA deny that request?

The citizen petition did not contain any additional medical information that was not already known. The FDA had taken appropriate actions based on the knowledge at that time. Since that time, more information has been obtained that raised enough additional concerns to warrant withdrawal of Redux from the market.

### 16. Is this just a disease of women?

Though the majority of cases of which FDA is aware are women, there is no reason at present to believe that men are not also at risk. Most of the use of these products is in women, so what we have seen to date could be only a reflection of the usage patterns of the products. FDA advises that both male and female patients consult their health care professionals.